**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| ELLEN CLARK, | : | Case No. 1:22-cv-199 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| CITY DASH, LLC, | : | |
| Defendant. | : | |

**ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND
DISMISSING THE CASE**

This civil action is before the Court on Defendant's Motion for Summary Judgment (Doc. 21) and the parties' responsive memoranda (Docs. 28, 29). Also before the Court are Defendant's Proposed Undisputed Facts (Doc. 22), as well as Plaintiff's Response to Defendant's Proposed Undisputed Facts (Doc. 26).

### I.  BACKGROUND

On April 11, 2022, Plaintiff Ellen Clark ("Plaintiff" or "Ms. Clark") brought this civil action against her former employer, Defendant City Dash, LLC ("Defendant" or "City Dash"), alleging race and age discrimination, as well as retaliation. (Doc. 1). A First Amended Complaint was filed on April 13, 2022 to correct typographical errors. (Doc 4).

A. **Undisputed Material Facts**[1]

   *1. Plaintiff's Employment History with City Dash*

Plaintiff Ellen Clark is an African-American woman, born in 1959. In 1997, Plaintiff began working for Defendant City Dash as a customer service representative. Within four months, Plaintiff was promoted to a customer service manager. During her time in the customer service department, Plaintiff stated that she maintained a "very great and successful working relationship" with Mr. Jim Bush, who was the owner and President of City Dash at the time. In 2010, Plaintiff became a billing and accounting specialist at City Dash. In this capacity, Plaintiff reported directly to City Dash's new president (as of 2005), Mr. Troy Burt, with whom Plaintiff also described have a "very great and successful working relationship." Indeed, Plaintiff encouraged her own daughter (who is also African-American) to work at City Dash, after Mr. Burt asked if Plaintiff's daughter would be interested in a position.[2] Plaintiff further reported that she had a respectful and positive relationship with many of her co-workers. (Doc. 20 at 161).

In 2020, Mr. Burt entrusted Plaintiff with the task of assisting in the customer service department. Specifically, Plaintiff maintained her position as a billing and accounting specialist but was physically relocated to the customer service department so as to allow her to assist with customer service issues as well. This arrangement was short-lived, however, as City Dash terminated Plaintiff's employment in October 2020,

---

[1] Citations to the record for these findings of undisputed fact are in Defendant's Proposed Undisputed Facts (Doc. 22) and Plaintiff's response to Defendant's proposed facts (Doc. 26).

[2] Plaintiff's daughter ultimately worked at City Dash for five years, from 2012 to 2017.

2

after 23 years of service to the company. At the time of her termination, Plaintiff was approximately 61 years of age and was the oldest member of her department.

### 2. Relevant Terms of Employment and Code of Conduct

Throughout her employment, Plaintiff was aware that City Dash had a company handbook, which handbook outlined policies regarding and procedures for addressing various potential workplace issues. Those policies and procedures included, *inter alia*, policies against harassment and discrimination, reporting procedures for any instances of harassment or discrimination, and a no-tolerance policy against workplace violence or threats of violence. Plaintiff was aware that a violation of company policy could result in disciplinary action, up to and including termination.

### 3. Events Relating to Plaintiff's Termination

City Dash employees have access to an internal messaging system known as "HUD," which system allows employees to send electronic messages to one another (*i.e.*, an instant messaging program). HUD messages are not private, and Plaintiff knew that City Dash had a right to review an employee's comments on the HUD system.

In October 2020, Plaintiff and another employee, Ria Goines, were exchanging messages on HUD. It is this October 2020 conversation between Plaintiff and Ms. Goines that ultimately led to Plaintiff's termination. Ms. Goines is African-American and is approximately 30 years Plaintiff's junior. Notably, Plaintiff alleges that a white co-worker, Misty Wallace, also participated in this conversation. However, Plaintiff cannot recall any statements Ms. Wallace allegedly made during the conversation in question, nor is there any evidence that Ms. Wallace was included on or actively

3

participated in the relevant portion of the conversation that led to Plaintiff's ultimate termination from City Dash. A screenshot of the HUD conversation shows that the relevant messages were between Plaintiff and Ms. Goines only. The screenshots do exclude some portions of the conversation. (*See*, *e.g.*, Doc. 20 at 157-58). Nevertheless, there is no evidence that any excluded messages were relevant to the issue at bar, nor that anyone other than Ms. Clark and Ms. Goines were involved in those messages.[3] There is also no evidence to suggest that the messages or the conversation, as presented, were altered in any way.[4]

In any event, during the relevant HUD conversation, Plaintiff and Ms. Goines discussed a male supervisor at City Dash, and Ms. Goines stated that this supervisor does not "know how to give instructions." (Doc. 20 at 157). As the conversation progressed, Plaintiff stated: "Before I am in the justice center with a murder charge." Ms. Goines responded with "hahahahaha," to which Plaintiff replied: "we laugh but I can see it happening."

---

[3] Ms. Goines did submit an Affidavit, attached to Plaintiff's response in opposition, stating that: "In or around October 2020, I received a final written warning related to messages exchanged on the HUD messaging with two other CityDash employees, Ellen Clark and Misty Wallace. Misty Wallace, a white employee, participated in the conversation on the HUD system for which I received a final warning." (Doc. 28-3 at ¶¶ 4-5). Ms. Goines's Affidavit does not, however, provide any information regarding the content of the conversations referenced nor offer any specificity as to Ms. Wallace's alleged involvement in the specific comments that led to Plaintiff's ultimate termination.

[4] Based on the evidence before the Court, including Plaintiff's deposition testimony, Ms. Wallace did participate in <u>other</u> HUD conversations with Plaintiff and Ms. Goines, in which disparaging comments were made about co-workers. City Dash issued a warning to Ms. Wallace for her involvement in these other conversations. (*See*, *e.g.*, Doc. 20 at 22-23, p. 84:25-86:8).

The following day, Plaintiff and Ms. Goines had another conversation on HUD, during which they discussed a male employee, whom they referred to as "tin man." Plaintiff stated in the messages that the employee was a "chicken," noting that he "left for lunch" immediately after a meeting. Approximately an hour later, the conversation continues as follows:

> GOINES: "chicken little still gone?"
> PLAINTIFF: "NOPE you was right he came back."
> GOINES: "shoot ya shot"
> PLAINTIFF: "NEED BULLETS AND A GUN"

Plaintiff alleges that she does not know or cannot recall which male employee(s) were being referenced in the HUD conversations. Nevertheless, Plaintiff does not dispute sending the messages, but states that she was just joking and venting her frustrations. It further bears noting that while Ms. Goines makes no statements of gun violence and, in fact, at one point actively discourages the rhetoric, Ms. Goines did make a singular comment that: "im sure about to have a break before i beak [sic] my foot off in someone." (Doc. 20 at 160).

Following the HUD exchange, another City Dash employee brought the messages to the attention of a supervisor and, ultimately, Mr. Burt, who forwarded the messages to HR.[5] After City Dash and HR's review of Plaintiff's messages, as well as HR's consultation with counsel, Plaintiff was terminated from City Dash, while Ms. Goines

---

[5] Based on Plaintiff's deposition, another employee saw some of the messages exchanged between Plaintiff and Ms. Goines after the messages were inadvertently exchanged under HUD's public rather than private setting. (Doc. 20 at 17, p.64:21-65:9). This in turn led to an investigation, which ultimately uncovered the messages threatening gun violence. (*Id*. at 168).

5

received a final warning and demotion. Ms. Wallace, whom Plaintiff claims was involved in the conversation (though not supported by the evidence), received a write-up for unprofessional comments made in *separate* conversations and was transferred to another department. Plaintiff understood Ms. Wallace's transfer to be a promotion, but Defendant clarifies in its reply brief that Ms. Wallace's transfer was lateral and did not come with a pay raise. (Doc. 29 at 4, n.1).

Following her termination, Plaintiff filed a charge of race and age-based discrimination with the Ohio Civil Rights Commission ("OCRC"). The OCRC conducted an investigation into Plaintiff's allegations of discrimination against City Dash, gathered relevant documents and testimony, and ultimately dismissed Plaintiff's charge. Specifically, the OCRC determined that it was not probable City Dash had engaged in an unlawful discriminatory practice and, instead, that Plaintiff's termination was the result of violating City Dash's code of conduct by sending inappropriate messages containing suggestions of violence. Plaintiff then filed the instant civil action.

**B. Plaintiff's Claims**

Plaintiff now raises claims of race discrimination, age discrimination, and retaliation. Specifically, Plaintiff alleges that: "On numerous occasions during her employment with Defendant, Plaintiff was subjected to constant, severe and pervasive, racially discriminatory comments and treatment." (Doc. 4 at 3, ¶ 17). Plaintiff further alleges that: "On multiple occasions throughout her employment, Plaintiff complained, both on her own behalf and on behalf of other employees who had presented concerns to her, about black employees being treated differently than white employees, and being

6

denied promotions and similar opportunities as white employees due to their race." (*Id.* at ¶ 18). Notably, however, <u>Plaintiff acknowledges, both in her deposition testimony and in an OCRC rebuttal statement, that she only ever reported racial discrimination to Mr. Burt on behalf of her co-workers and that she never reported any instance of racial discrimination on her own behalf to anyone</u>. (Doc. 20 at 43, p. 166:3-167:25; *id.* at 161-62).

Plaintiff further alleges in her Complaint that, despite repeatedly reporting instances of racial discrimination to Mr. Burt, Defendant failed to remedy the racially-discriminatory work environment and, instead, "Defendant terminated Plaintiff in direct retaliation for her ongoing and consistent complaints of race discrimination." (*Id.* at 4, ¶¶ 19-20). In her deposition and OCRC rebuttal, Plaintiff recounts numerous instances, going back roughly a decade, in which co-workers came to her with complaints of racial discrimination, all of which she says she relayed to Mr. Burt, only to have those complaints apparently ignored. (*See*, *e.g.*, *id.* at 162 ("Whatever was brought to me I would always take the matter to Mr. Burt. Mr. Burt looked the other way far too often when situation of racial discrimination w[ere] brought to his attention")). Nevertheless, Plaintiff also testified during her deposition that Mr. Burt was diligent in addressing workplace issues, stating that: "He [Mr. Burt] would address things right then." (*Id.* at 42, p. 164:10-11). Plaintiff also acknowledged that she knew she could escalate her complaints to HR, but that she never did so, despite a decade of alleged inaction by supervisory staff. (*Id.* at 38, p. 148:17-149:5).

7

Plaintiff further alleges that while City Dash claims her termination was due to City Dash's no-tolerance policy against workplace violence, her co-workers, Ms. Goines and Ms. Wallace, one of whom is white and both of whom are "significantly younger than Plaintiff" were not terminated for their involvement. (Doc. 4 at ¶¶ 20-23).

## II. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but … must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*. at 249.

## III.  ANALYSIS

Plaintiff raises claims of race discrimination and retaliation, in violation of Ohio Rev. Code § 4112 and Title VII, as well as age discrimination under Title VII.  (Doc. 4).[6]

"A plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of discrimination."  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (citing *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir.1997)). The same holds true of a Title VII retaliation claim, which claim "can be established 'either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation.'"  *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (quoting *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 538 (6th Cir. 2008)).

When a plaintiff relies on circumstantial evidence of discrimination or retaliation, as Plaintiff does in the instant case, the Court applies the "*McDonnell Douglas* burden-shifting approach" to evaluate the allegations.  *Moore v. Coca-Cola Bottling Co. Consol.*, 113 F.4th 608, 622, 627 (6th Cir. 2024) (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007); *Laster*, 746 F.3d at 730); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

---

[6] The Court considers Plaintiff's Title VII and § 4112 claims under applicable federal case law. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 n.4 (6th Cir. 2000) (citing *Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm.,* 61 Ohio St.3d 607, 575 N.E.2d 1164, 1167 (1991) ("[W]e have determined that federal case law interpreting Title VII ... is generally applicable to cases involving alleged violations of R.C. Chapter 4112.")).

9

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination or retaliation. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252-53 (1981); *Laster*, 746 F.3d at 730. If the plaintiff successfully makes a *prima facie* case, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802; *Laster*, 746 F.3d at 730. Finally, if the defendant carries its burden, the burden shifts back to the plaintiff to prove that the defendant's stated reasons are a pretext. *Burdine*, 450 U.S. at 253; *Laster*, 746 F.3d at 730.

As set forth, *infra*, the Court finds that: (1) Plaintiff fails to make a *prima facie* case for her claims of race discrimination, age discrimination, and retaliation; (2) even if Plaintiff had met her initial burden, City Dash had a legitimate, non-discriminatory reason for its decision to terminate her employment; and (3) Plaintiff fails to show that City Dash's articulated reason is a mere pretext. Accordingly, summary judgment in favor of Defendant is appropriate.

**A. Race and Age Discrimination Claims**

To establish a *prima facie* case of race or age discrimination, Plaintiff must show, by a preponderance of the evidence, that: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) she was qualified for the position she held; and (4) similarly situated employees outside of the protected class were treated more favorably. *Moore v. Coca-Cola Bottling Co. Consol.*, 113 F.4th 608, 622 (6th Cir. 2024) (citing *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016)). Defendant does not dispute that Plaintiff satisfies the first three elements and, therefore,

10

the Court focuses solely on the final element, *i.e.*, whether Plaintiff was treated differently from similarly situated employees outside of the protected class.

To show that she is "similarly situated," Plaintiff is "required to prove that <u>all of the relevant aspects of h[er] employment situation were 'nearly identical'</u> to those of [the comparison employee's] employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)) (emphasis added). "Thus, to be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (citations omitted).

Here, Plaintiff fails to show that <u>similarly situated</u> employees <u>outside of the protected class</u> received more favorable treatment. Plaintiff argues that she was the only employee to be terminated for making threats of violence, despite two other employees—Ms. Wallace and Ms. Goines—participating in the conversation. However, Plaintiff fails to evidence that she was similarly situated to either Ms. Wallace or Ms. Goines.

To start, Plaintiff has no evidence that Ms. Wallace made any violent statements nor even that Ms. Wallace participated in the relevant conversation at all. Indeed, the evidence before the Court unequivocally shows that Ms. Wallace was not a party to any of the relevant portions of the HUD conversation. (Doc. 20 at 157-60). Moreover, even assuming, *arguendo*, that Ms. Wallace was part of the conversation and that her messages

11

were somehow excluded, Plaintiff cannot recall, and there is no evidence of, Ms. Wallace making any threatening or violent statements. (*Id*. at 14-15, p. 53:24-54:3). Thus, Plaintiff fails to meet her initial burden to show that she and Ms. Wallace were similarly situated and should have therefore received similar treatment. Notably, this conclusion is fatal to Plaintiff's race discrimination claim in its entirety, given that Ms. Goines is not outside of the protected class.

Plaintiff also fails to show that she and Ms. Goines were similarly situated. While Ms. Goines certainly participated in the HUD conversation, her statements are entirely distinguishable from Plaintiff's comments. Specifically, unlike Plaintiff, Ms. Goines neither threatened to commit nor alluded to committing murder, nor did Ms. Goines make any mention of gun violence. Indeed, as this Court previously noted, at one point, Ms. Goines even discourages Plaintiff's heightened rhetoric (*e.g.*, stating "thats [sic] what ya words are for," in response to Plaintiff's comments about needing bullets and a gun). (*See id.* at 160). Admittedly, during the course of the conversation, Ms. Goines does make the comment: "im sure about to have a break before i beak [sic] my foot off in someone." (*Id*. at 160). But Ms. Goines's statement, while inappropriate, simply does not carry the same level of threat as Plaintiff's references to murder and gun violence. To start, the comment was not directed at any specific person, unlike Plaintiff's very direct statements. Moreover, Ms. Goines makes her comment on one occasion and does not raise it again. Conversely, Plaintiff referenced guns and murder on two separate occasions—indeed, on two separate days. (*Id*. at 158, 160). In fact, after her reference to committing murder, Plaintiff doubles down on the comment, clarifying that "we laugh

12

but I can see it happening." (*Id*. at 158). In short, Plaintiff's comments were more frequent, more targeted, and more serious than those of Ms. Goines. Accordingly, Plaintiff fails to evidence that she and Ms. Goines were similarly situated.

In sum, Plaintiff fails to present evidence from which a reasonable jury could conclude that she was treated differently compared to other similarly situated employees. Therefore, Plaintiff fails to meet her initial burden to make a *prima facie* showing of discrimination, and summary judgment in favor of Defendant is appropriate with regard to the race and age discrimination claims.[7]

However, even assuming *arguendo*, that Plaintiff had met her initial burden, summary judgment would still be appropriate on the balance of the *McDonnell Douglas* analysis.

Specifically, City Dash has asserted a legitimate, nondiscriminatory basis for Plaintiff's termination—*i.e.*, Plaintiff violated City Dash's policy against workplace threats and violence. *See Blackshear v. Interstate Brands Corp*., 495 F. App'x 613, 618 (6th Cir. 2012) (defendant met its burden to present legitimate, nondiscriminatory reason

---

[7] The Court notes that Plaintiff has also alleged it is common for City Dash employees to vent frustrations on HUD. However, Plaintiff has offered no evidence from which any rational trier of fact could conclude that these other conversations are comparable or that the other employees were similarly situated to Plaintiff. Plaintiff has also recounted some more specific instances in which an employee engaged in inappropriate, violent, or threatening behavior while in the workplace. However, even to the extent that Plaintiff identifies these employees by name and provides her recollection of the circumstances, the instances she describes occurred years prior to Plaintiff's termination, and there is no evidence to support the conclusion that the employees were similarly situated or received different treatment to Plaintiff. *See Mitchell*, 964 F.2d at 583 (explaining that a similarly situated employee would be one who reports to the same supervisor, is subject to the same standards, and engaged in the same conduct without any relevant differentiating or mitigating circumstances).

for adverse employment action by offering evidence that it terminated plaintiff for violating Workplace Violence Policy); *Merriweather v. United States Steel Corp.*, No. 2:18-CV-10664, 2019 WL 4072645, at *12 (E.D. Mich. July 19, 2019) ("A threat of violence is a legitimate, nondiscriminatory reason for termination which would support a finding that unlawful discrimination was not the cause of the employment action").

Here, Defendant's evidence shows that it has a no-tolerance policy against workplace violence or threats of violence, as set forth in its employee handbook. (*Id.* at 155). And Plaintiff acknowledged that, during her employment, she was aware of and received copies of the employee handbook each time it was revised. (*Id.* at 9, p. 31:3-13). Plaintiff also stated in interrogatories that she had read and understood the employee handbook. (*Id.* at 133). Defendant also evidences that, after Plaintiff's messages came to light, the conversation was viewed by Defendant's third-party HR company and counsel, and that the decision was made to terminate Plaintiff for violating City Dash's policy against workplace violence/threats of violence. (*Id.* at 168, 169, 174, 175). Accordingly, City Dash has met its burden to articulate a legitimate, nondiscriminatory reason for terminating Plaintiff's employment.

Finally, Plaintiff fails to meet her burden that City Dash's explanation is a mere pretext. "The plaintiff may demonstrate that the defendant's explanation was merely pretext by showing (1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the termination, or (3) that the proffered reason was not sufficient to motivate the discharge." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th

Cir. 2000) (citing *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

Here, Plaintiff argues that City Dash's explanation is a pretext because City Dash has not consistently applied its policy against workplace violence in other situations and to other employees. (Doc. 28 at 17-20). This argument fails. Specifically, with regard to Ms. Goines and Ms. Wallace, this Court has already concluded that the Plaintiff was not similarly situated. Plaintiff also raises three other examples, all of which are equally distinguishable from Plaintiff's own. (*Id*. at 18-19).

First, Plaintiff references an altercation from 2014 between two male employees, one of whom was African-American and the other was white. Plaintiff testified regarding this incident during her deposition and specifically describes a "heated" exchange that almost escalated into a fight but for Plaintiff intervening. (Doc. 20 at 39, p. 151-153). Plaintiff also testified that she did not hear either of the men make threats of violence. (*Id*. at 40, p. 154:7-10).

Next, Plaintiff states that a white, male employee frequently referenced owning guns and that he would shoot anyone who broke into his home. (Doc. 28 at 18-19). But Plaintiff testified that this employee never threatened anyone at City Dash, and that his comments were specifically in reference to a potential intruder in his own home. (Doc. 20 at 40, p. 154:24-155:3).

Finally, Plaintiff references a white, male employee who had angry outbursts in the workplace and in front of customers, and allegedly made threats towards another white co-worker. (Doc. 28 at 19). Significantly, however, and as Plaintiff acknowledged

15

during her deposition, this employee <u>was terminated for his conduct</u>. (Doc. 20 at 41, p. 159:13-15). Therefore, this example does not support Plaintiff's position.

In short, Plaintiff fails to establish that City Dash's explanation is a pretext or that the decision was motivated by anything other than a violation of company policy. Thus, summary judgment in favor of Defendant is appropriate as to the discrimination claims.

## B. Retaliation Claim

Plaintiff also alleges that her termination was in retaliation for her years of reporting racial discrimination in the workplace. (Doc. 4 at 5). In order to establish a *prima facie* case of retaliation, Plaintiff must demonstrate: (1) she "engaged in activity protected by Title VII"; (2) her "exercise of such protected activity was known by the defendant"; (3) "thereafter, the defendant took an action that was materially adverse to the plaintiff"; and (4) "a causal connection existed between the protected activity and the materially adverse action." *Laster*, 746 F.3d at 730. Defendant does not dispute the first three elements and, therefore, the Court focuses on whether Plaintiff has established a causal connection between her protected activity (*i.e.*, reported discrimination in the workplace) and the adverse employment action (*i.e.*, her termination).[8]

---

[8] It does, however, bear reiterating that Plaintiff testified, during her 23 years of employment with City Dash, <u>she never reported any instances in which Plaintiff herself was discriminated against</u>. (Doc. 20 at 43, p. 166:3-24). Rather, according to Plaintiff, she only ever acted as a middleman to relay other employees' complaints of racial discrimination to Mr. Burt. (*Id*. at 43, p. 167:22- 24). Plaintiff also acknowledged that she only ever alerted Mr. Burt of these complaints and never escalated the complaints to HR, even in the face of Mr. Burt's alleged inaction or indifference. (*Id*. at 38, p. 148:17-149:5). Thus, based on Plaintiff's own testimony that she never escalated these complaints, there is no evidence that anyone at City Dash's third-party HR company knew of Plaintiff's role in relaying complaints nor did they have any reason to suspect that Plaintiff may be experiencing racial discrimination in the workplace.

16

"To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). The burden of proof at this stage is minimal, as a plaintiff need only "put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Id.* (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)).

"Proof of temporal proximity between the protected activity and the adverse employment action, 'coupled with other indicia of retaliatory conduct,' may give rise to a finding of a causal connection." *Gonzales*, 481 F.3d at 333 (quoting *Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724, 737 (6th Cir. 2006)). On the other hand, a lack of temporal proximity (*i.e.*, a lengthy delay between the protected activity and the adverse action) very much undermines the notion that the employer acted in retaliation. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) ("Action taken … 20 months later suggests, by itself, no causality at all").

Here, Plaintiff alleges that, <u>over the course of 23 years</u>, she relayed complaints of racial discrimination, on behalf of other employees, to Mr. Burt, on a number of occasions. All of these instances, however, according to Plaintiff's own deposition testimony, occurred many years before Plaintiff's termination. Indeed, the only relatively recent incident that Plaintiff identified in her testimony was a complaint that she made to Mr. Burt, sometime in early-2020 (*i.e.*, months before Plaintiff's termination), regarding a co-worker, Regina Curl. (Doc. 20 at 44, pp. 170:4-172:16).

17

Ms. Curl was the longtime manager of the customer service department; however, Plaintiff did not report to Ms. Curl and, in fact, Plaintiff and Ms. Curl were considered to be of equal standing within the company. (*Id*. at 7, pp. 24:18-25:5). Plaintiff testified that, after she returned to the customer service department in January 2020, Ms. Curl was not pleased and maintained a poor attitude towards Plaintiff (though Plaintiff does not specify the type of behavior involved). (*Id*. at 44, pp. 170:23-171:10). Plaintiff complained to Mr. Burt about the general treatment she was receiving from Ms. Curl but, notably, at no point did Plaintiff tell Mr. Burt that the treatment was racially motivated or discriminatory. (*Id*. at 44, pp. 171:7-172:5). Moreover, despite complaining to Mr. Burt about Ms. Curl, Plaintiff testified that she also told Mr. Burt that Ms. Curl's "attitude" was nothing new and it "would be fine." (*Id*. at 44, pp. 171:7-15, 172:10-16).

To state the obvious, this incident—which, again, is the only somewhat recent example Plaintiff provides—occurred months prior to Plaintiff's termination, did not involve any allegation of racial discrimination, was not escalated, and did not result in or apparently even call for any intervention or formal action due to Plaintiff's own assurances to Mr. Burt that it "would be fine." In short, Plaintiff, at best, informally complained about a personal workplace conflict and then immediately defused the situation herself. And while poor treatment from a fellow co-worker is certainly not "fine" nor something that an employee should simply have to tolerate, the Court's focus here must be on whether Plaintiff's termination is causally connected to her complaints of racial discrimination in the workplace. Therefore, Plaintiff's most recent cited incident involving Ms. Curl simply does not rise to that level.

That said, the Court acknowledges that, according to Plaintiff, Ms. Curl was at the core of some prior complaints relayed to Mr. Burt. However, again, these complaints occurred years prior to Plaintiff's termination. And, for purposes of the retaliation claim, Plaintiff presents no evidence that Ms. Curl knew of Plaintiff's years of relaying complaints to Mr. Burt. Nor does Plaintiff argue or present any evidence that City Dash terminated Plaintiff in defense of Ms. Curl. Nor is there any evidence at all to suggest that Ms. Curl had or exercised any influence over City Dash's termination decision.[9]

In short, Plaintiff's evidence shows that, over the course of her 23 years of employment, no disciplinary or punitive action was taken against Plaintiff for her role in serving as an intermediary and raising complaints on behalf of other employees. Rather, Plaintiff herself acknowledges that she maintained a good working relationship with her superiors and most of her co-workers. And there is simply no evidence of any causal connection between Plaintiff's historical complaints and Plaintiff's October 2020 termination. Accordingly, Plaintiff fails to make a *prima facie* showing of retaliation.

Additionally, even if Plaintiff had met her burden of establishing a *prima facie* case, for the same reasons the Court set forth, *supra*, as to the discrimination claims,

---

[9] To be clear, Plaintiff alleges that Ms. Curl did play some role in uncovering Plaintiff's HUD messages. However, City Dash's contemporaneous notes of the HUD incident identify Plaintiff's manager, Amber Switzer, as the person who led the initial investigation and brought the messages to Mr. Burt's attention. (Doc. 20 at 168). In any event, even if Ms. Curl were responsible for initially spotting the messages, City Dash's employee handbook specifically instructs employees to "immediately report any infraction [of the workplace violence policy] to their supervisor or Sheakley HR Solutions." (*Id*. at 155). Moreover, Plaintiff neither denies sending the messages nor does she specifically deny that sending violent or threatening messages would run afoul of appropriate workplace conduct. (*See id.* at 19, pp. 72:24-73:2) ("Q. All right. Do you agree that some of the messages on the HUD system were not appropriate for [the] workplace? A. Other than the violent ones, no") (emphasis added).

19

Plaintiff's retaliation claim would fail the balance of the *McDonnell Douglas* analysis. That is, City Dash has met its burden to articulate a legitimate, nondiscriminatory reason for terminating Plaintiff's employment (*i.e.*, her violation of the workplace violence policy). And Plaintiff fails to establish that City Dash's explanation is a pretext or that the decision was motivated by anything other than a violation of company policy. Thus, summary judgment in favor of Defendant is appropriate as to the retaliation claim.

### IV.  CONCLUSION

Based upon the foregoing, Defendant's motion for summary judgment (Doc. 21) is **GRANTED**, and this case is dismissed with prejudice. The Clerk's Office shall docket a Judgment accordingly.

**IT IS SO ORDERED**.

Date:  12/19/2024

*Timothy S. Black*
Timothy S. Black
United States District Judge